INTERNATIONAL CURTIS MARINE TURBINE CO. et al. v. WILLIAM CRAMP & SONS SHIP & ENGINE BLDG. CO.

(Circuit Court of Appeals, Third Circuit. February 16, 1914.)

No. 1622.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—STEAM TURBINE.

The Curtis patent, No. 566,969, for an elastic-fluid turbine, covers an improved turbine of the impulse type, theretofore represented solely, so far as a practical mechanism was concerned, by the invention of De Laval, which, owing to the high speed developed, could be utilized only in turbines of small size, while the opposite or reaction type was similarly represented by that of Parsons, which, owing to various defects, could be applied only to those of large size. While these inventors were pioneers in the art, and their inventions noteworthy and meritorious, Curtis succeeded

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in blending the advantages and avoiding the disadvantages of both, and his patent discloses a principle and means of operation applicable to turbines of all sizes consisting, "broadly stated, of pressure-staging an impulse turbine, the velocity compounding thereof and the abstraction at each passage of the steam of substantially all, or the principal part, of the vis viva developed at the preceding stage." Such patent was not anticipated and discloses invention of high order; also, *held* infringed.

**2.** PATENTS (§ 235*)—INFRINGEMENT—MACHINERY—SIMILARITY.

The test of infringement of a patented machine is not its physical appearance, but the principle on which it operates.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 371; Dec. Dig. § 235.*]

**3.** PATENTS (§ 16*)—INVENTIONS—ELEMENTS.

The inventive element of a patented device or machine may consist in the conception of a novel abstract idea, or in the practical means of applying what has theretofore been but a mere abstract idea. In the former, the conception of the abstract idea necessarily involves the details of utilizing it; but in the latter, it does not.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 14, 15; Dec. Dig. § 16.*]

**4.** PATENTS (§ 312*)—SUIT FOR INFRINGEMENT—PROOF OF INFRINGEMENT.

Where a defendant, in its proposal for a government contract, which was accepted, specified a machine which as described would infringe complainant's patent, the court is justified in finding infringement, in the absence of evidence from defendant showing what it did in fact furnish.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 543–549; Dec. Dig. § 312.*]

**5.** PATENTS (§ 328*)—VALIDITY—STEAM TURBINE.

The Curtis patent, No. 595,435, for an elastic-fluid turbine claims 1 to 4, inclusive, covering generically the use of cut-off devices in a steam turbine of the impulse, pressure-staging type, whereby different chambers can be operated or by-passed as desired, are void as too broad in view of the prior steam art.

**6.** PATENTS (§ 288*)—SUIT FOR INFRINGEMENT—EQUITY JURISDICTION.

A court of equity is not without jurisdiction of a suit for infringement of a patent because the alleged infringement by defendant consists in its contracting to furnish the infringing devices to the United States government as a part of the equipment of a naval vessel, and entering upon the work of their construction, nor is it deprived of jurisdiction to hear and decide the suit because prior to the hearing the devices were installed and delivered to the government, and an injunction cannot properly be granted.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 460–466; Dec. Dig. § 288.*]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

Suit by the International Curtis Marine Turbine Company and the Curtis Marine Turbine Company of the United States against William Cramp & Sons Ship & Engine Building Company. Decree for defendant was reversed on appeal (202 Fed. 932, 121 C. C. A. 290), and on certiorari to the Supreme Court the decree of the Circuit Court of Appeals was reversed (228 U. S. 650, 33 Sup. Ct. 722, 57 L. Ed. 1003),

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and on a second hearing in the Circuit Court of Appeals the decree was reversed and the case remanded, with instructions.

See, also, 176 Fed. 925.

The following is a diagram of the patent in question:

*Fig. 1.*

C. Bradford Fraley, of Philadelphia, Pa., and Richard N. Dyer and Frederick P. Fish, both of New York City, for appellants.

Dickson, Beitler & McCouch, of Philadelphia, Pa., Edwards, Sager & Wooster, and James R. Sheffield, all of New York City, for appellee.

Before GRAY and BUFFINGTON, Circuit Judges, and YOUNG, District Judge.

BUFFINGTON, Circuit Judge. In the court below the International Curtis Marine Turbine Company, the owner of certain patents, and

the Curtis Marine Turbine Company, exclusive licensee thereunder for marine propulsion, brought suit against the William Cramp & Sons Ship & Engine Building Company for infringement thereof. The claims involved are 1 to 11, inclusive, of patent No. 566,969, granted September 1, 1896, to Charles G. Curtis for an elastic-fluid turbine, and the first four claims of patent No. 595,435, granted December 14, 1897, to said Curtis for an elastic-fluid turbine also.

After final hearing the court below entered a decree dismissing the bill. On appeal this court (202 Fed. 932, 121 C. C. A. 290) reversed such decree in part and affirmed it in part. On certiorari the Supreme Court held (228 U. S. 650, 33 Sup. Ct. 724, 57 L. Ed. 1003)—

"that the case was tried and disposed of below by a court organized, not in conformity to law, but in violation of the express prohibitions of the statute."

It further held:

"Our duty is not to hold the case upon the docket, for ultimate decision upon the merits, but to at once reverse and remand to the court below, so that the case may be heard by a competent court, conformably to the requirements of the statute."

In accordance therewith the case has been heard again by this court as properly constituted. The importance of the case and the complexity of its subject-matter—the steam turbine art—has led to our giving unrestricted time and most careful consideration to its argument, and must serve to explain the length and detail of this opinion.

[1] A rotary steam engine had been the engine builder's goal, for the advantage of rotary over reciprocating machinery movement is self-evident. In the hydraulic field the rotary principle had been effectively used in wheels and in many effective types of turbines, which are really jacketed water wheels. In this latter branch the advance was marked and the conservation of power, simplicity of parts, saving of space, and other desirable features of water turbines seemed to disclose the means by which steam could be similarly employed to move turbines. Theoretically the analogy between the use of steam and water in the same mechanical form of structure seemed clear. But such analogy was a mere surface and therefore a misleading one. In reality steam and water are, from the standpoint of motive power, essentially different. The motive power of water is gravity, or pressure exerted in one direction; of steam it is expansion, or pressure exerted in all directions. The laws of hydraulics, as applied to water wheels, were well known and comparatively simple, while, as the outcome proved, the laws of steam as applied to turbines were not known or appreciated. Moreover, water is unchanging in volume under different pressures; thus the velocity of the flow or jet of a stream is in inverse proportion with the cross-section of path provided for it. But when velocity is developed by diminution of pathway, it must be at the expense of a local deficit of pressure. Whenever the path contracts, velocity increases, and pressure diminishes by a determinable amount. But with steam all is different. Only in few instances does steam act in the same way as water, and even where it does there is always present an intricate and mathematically-inexpressible relationship between

steam volume and pressure to complicate the relation between cross-section of path and velocity of flow. Experience has further shown that steam turbines involve further perplexities in the form of absorption of energy caused by virtually every bend, change of cross-section and tiny eddy.

That steam could be used as a propulsive rotary force was of course well and long known. From the record before us we learn that a crude form of steam turbine was described by Hiero of Alexandria 120 years before Christ. It used steam as a kicking or propulsive force from which the discharging wheel reacted in the same way that rearwardly discharged water drives in the opposite direction an ordinary rotary lawn sprinkler. So also, as early as 1629, the turbine of Branca, an Italian, showed how steam could be jetted against a vane to produce forward rotary motion. But while these two, almost forgotten, instances strikingly show that the two broad principles of operation on which, as we shall see, all modern turbine development is based were thus known, no practical and efficient steam turbine, working on either principle, was developed prior to 1884. And this absolute dearth of outcome cannot be attributed to lack of effort, for in 1896, the date of the first patent in suit, Sosnowski's Treatise Roues et Turbines a Vapeur gave a list with illustrations of 300 prior steam turbines. Apart, however, from those of the two inventors, Parsons and De Laval, referred to hereafter, no one had, in this broad field of effort, produced a practical and efficient device. The magazine Engineering, in an issue of August, 1894, said:

"Most engineers who are approaching middle age can remember when the idea of making a successful steam turbine was classed with the search for the philosopher's stone. It was known of course that such a motor could be readily made to work, but the consumption of steam was excessive because the motive fluid left the apparatus at a high velocity and with much of its energy unutilized. * * * What was wanted was to construct a wheel that would run several times as fast as the spindle of a mule, and most mechanics regarded the matter as impossible."

The experts appointed by the Court of Commerce of the Canton of Zurich, Switzerland, in certain litigation involving steam turbines, reported that "the art of steam turbines was first brought into existence by Parsons and De Laval." Indeed, this is, in substance, conceded by respondent's expert, who, in answer to the question whether he agreed with the statement made by Neilson in his work on Steam Turbines (4th Ed., 1908) that the Parsons and De Laval turbines were the only two turbines which had been made on other than an experimental scale up to 1895–96, said:

"Limiting your question to steam turbines I should answer it that the Parsons steam turbine and the De Laval steam turbine are the only ones that I know of that were being manufactured prior to 1896 that are being manufactured for commercial use to-day."

Passing by, therefore, the fruitless effort of prior inventors we take up the practical and effective stage of the steam turbine art with Parsons and De Laval. Parsons, the real pioneer of one branch of the art, was a British subject who in his English patent, No. 6735 of 1884, gave the world its first effective steam turbine. A study of this patent

shows that Parsons disclosed no undiscovered law of nature or any novel principle. His basic principle of operation was the reaction shown in prior devices, but, this being the first real practical and efficient device in a barren field of effort, Parsons has been justly regarded as the pioneer of the steam turbine art. As well as said by one of complainants' witnesses:

"It can therefore be said that, although Parsons did not introduce principles not known prior to his invention, he designed an efficient reaction turbine, whereas, in all the structures devised previously no efficient conversion of the energy of the steam into mechanical work was possible."

To the same effect is the testimony furnished by respondent in the address of Rateau, a French savant, in his Chicago address in June, 1904, who, in speaking of the production of an unworkable speed where steam expansion takes place in a single stage of a single wheel, says, evidently from the context, referring to Parsons:

"A consideration of these circumstances has induced inventors to divide the expansion of the steam into successive stages, and thus to produce turbines with multiple wheels, which are nothing but a series of simple turbines mounted upon the same shaft and driven successively by the same current of steam. This design of multiple turbines is by no means novel. It will be sufficient to mention the name of Tournaire, a French mining engineer, whose theoretical description to the Academy of Science in 1853 of a reaction turbine with multiple wheels is surprising when the description is compared with the Parsons turbine brought into use 30 years later."

Parsons used a large outer shell or chamber provided with a central shaft, and adapted to receive steam peripherally at one end and exhaust at the other. Mounted on a shaft were a number of sets of moving vanes properly angled, through which the steam passed as an annulus, thereby imparting motion. The outer ends of the moving vanes of each set fitted closely to the shell, prevented steam escape, and necessitated it going through the inter-vane passages. Following each set of movable vanes were corresponding sets of stationary vanes attached to the shell at substantially such an opposite angle as deflected the steam and caused it to pass through a succeeding set of movable vanes, so corelated to the first movable set as to coact in revolving the shaft. The power of steam to impart motion is based on pressure, and pressure is but expansion restrained. It follows, therefore, that, in the principles of operation of Parsons' turbine, as the steam passed from the high pressure end of the chamber through the successive sets of movable vanes to the exhaust, it expanded, decreased in pressure, and imparted rotary motive power to the movable vanes. And just as in a common lawn sprinkler the passage of the water through a turned passage caused the wheel to kick or react in a contrary direction, so in Parsons' turbine the expansive force of the volume of steam passing through a revoluble vane, angled at the discharge, reacts and causes the vane to rotate in a course opposite to the line of discharge. It is this drop of pressure, and the consequent different stages of pressure between the inlet and outlet side of the movable vane, that characterizes and is the differentiating earmark of reaction turbines. This drop

pressure, as the underlying principle of the reaction turbine, is well set forth by complainant's expert, who says:

"The essential difference between reaction and impulse turbines is the one as to how mechanical work is obtained from the energy of the steam. In both types of turbines the initial energy is in the shape of steam under high pressure, either in a dry or saturated or superheated condition. In a reaction turbine this steam is permitted to pass through a number of rows of buckets in such a manner that the pressure of the steam on the entering side of the bucket is quite different from the pressure of the steam upon the leaving side of the bucket, and rotation, that is, mechanical work, is secured, due to the drop of pressure of the steam in passing through the bucket."

It follows, therefore, as stated in Jude on The Theory of Steam Turbines—London, 1906—page 16, and conceded by respondent's expert, that:

"In the reaction turbine there is a transformation of potential energy into kinetic energy within the rotating member."

But such turbines have other characteristics. For example, from this pressure drop in reaction turbines it follows that the entire steam passage between the movable vanes must be filled with steam, and as stated by M. Rateau:

"It is of course necessary, in order to produce a good dynamic efficiency, to operate in such a manner that the peripheral speed of the turbine be not much inferior to the circulation speed of the steam."

It will thus be seen that what Parsons did was to take the well-understood principle of a reaction turbine and its single chamber, with a single wheel which operated at an unworkable speed, and by increasing the number of such wheels in effect subdivide an entire chamber into a number of separate, pressure-staged sections. Such, in reality, was the effect of the pressure being different on the opposite sides of every set of movable vanes.

The practical result obtained by Parsons by this pressure-staging was to reduce the speed of a reaction turbine to practical workable limits. It will, of course, be noted that the Parsons or reaction pressure turbine operated on a fundamentally different principle from a turbine, for example, of Branca's type. In the latter the propulsive force is the impact or impulse of a jet of steam against the movable vane. The steam is blown against the vane in the form of a jet, in a manner resembling the impulse given to a projectile by an explosion in the barrel of a gun. This is well stated by complainant's expert, who says:

"The powder charge on being fired develops a large pressure in a confined space similar to the pressure of steam in a boiler and steam pipe. The projectile is forced outward by the expansion of this charge, that is, the pressure energy available is utilized in producing movement of the projectile. The projectile is moved by the reaction of the charge just as the buckets of a reaction steam turbine are moved, due to the reaction of the steam. In both the gun and reaction turbine the energy in the form of pressure acts by reaction upon the piece on which work is to be performed, in one case causing linear motion, in the other case circular motion, and in both cases the initial pressure drops to the pressure of the exhaust or atmosphere. The energy represented by the drop of pressure from initial to exhaust is used to produce mechanical work. In both the gun and reaction turbine an important requirement for an efficient conversion of pressure energy into work by the reaction principle is close clearance between the moving and stationary parts so as to

prevent leakage of the pressure energy. After the projectile leaves the gun it possesses velocity energy. This is similar to the velocity energy of the steam jet as it leaves the nozzles of an impulse turbine. The nozzles give the steam a large velocity at the expense of the pressure energy of the steam; that is, the steam in passing through the nozzle drops in pressure from the initial pressure to the exhaust pressure and in expanding to the exhaust pressure produces a high velocity of the steam."

It will thus be seen that the impulsive force is created, not in the vane passage, but in the passageway into the chamber. This is conceded by respondent's expert, who, following Jude's work cited above, says:

"In the impulse turbine the transformation of potential energy into kinetic energy takes place wholly or only in fixed passages prior to entry into the rotating member."

As therefore vane motion in impulse turbines is caused by the jet impulse as distinguished from the expanding volume of the passing steam in a reaction turbine, it follows that the entire vane passageway of the former need not be filled. It also follows that the jet speed must be greater than the vane speed, otherwise no power would be drawn from the jet by the vane. It is proper to say that in making these general statements as to these two types of turbines, we have not over-looked the fact that reaction turbines may have some impulse, and impulse ones some reaction. But such respective reaction and impulse are negligible. This is well stated by complainant's expert, who says:

"The facts of the case are that it is an accepted fact among all engineers conversant with the steam turbine art that the impulse turbine derives its power chiefly from the impulse effect of the steam; some impulse turbines may work with a very slight reaction effect, and that all reaction turbines abstract work chiefly from the reaction force of the steam, although every reaction turbine has a small amount of impulse due to the velocity of steam flowing through the turbine. This is absolutely necessary because if there was no velocity of flow, steam would not pass through a reaction machine. The velocities in a reaction turbine are extremely low, and therefore the impulse effect is small, whereas the velocities in an impulse turbine are extremely high and the reaction effect or pressure drop of the steam while passing through an impulse turbine is so slight that it is entirely negligible."

But up to and succeeding Parsons, patented impulse turbines had been as inefficient as reaction ones had been before Parsons made the latter practical. This inefficiency of impulse turbines was due to the characteristics of steam subjected to the structural limitations, the restricted passageway, which created the jet. This is clearly explained by complainant's expert, who says:

"When water, steam or any other fluid in a reservoir approaches a constricted outlet, it must do so along converging lines. Although there may be no converging solid walls, and the outlet may be even a plane orifice, the cross-section of the path of the fluid, converging simultaneously toward the outlet from all directions, is a decreasing one. Hence the fluid undergoes acceleration as it approaches. To supply the kinetic energy involved in the acceleration, its pressure must decrease. In the case of water, as already noted concerning the Pelton (water) wheels of the West, there is no known limit to the intensity of pressure which can be converted completely and efficiently into velocity by such a simple constriction of path. With steam, however, this conversion can proceed only until the initial pressure has fallen by some 43 per cent., *with a conversion of something like 15 per cent. of the available*

*potential energy into kinetic form. Beyond this point no further reduction of pressure against the outlet can further accelerate the flow.* The reason for this is that the reduction in pressure upon the steam approaching the outlet leads to an increase in its volume, and this increased volume accentuates the congestion. Up to the so-called 'critical' point, this increase of congestion is not enough to more than hinder and complicate the acceleration. At the critical point, however, it becomes prohibitive. The steam expands too rapidly to get out of its own way, until the constriction has been passed. * * * The critical pressure occurs, with fair constancy, at about 43 per cent. of the initial absolute pressure. The critical velocity is usually found between 1,350 and 1,400 feet per second, ranging upwardly toward 1,500 feet under high initial pressures and downwardly toward 1,300 feet under initial pressures below atmospheric. The critical area varies widely, from small under high pressure to large under low pressure."

Stating this in terms of plain working result, the impulse turbine of the old art could only utilize 15 per cent. of the potential possibility of steam, a result which, apart from other objections, barred its practical use. It will thus be seen that no matter what the form of prior impulse turbines, or how instructive and prophetic, read in the light of after discoveries, the statements of their inventors may appear, they were all in reality. and necessarily ineffective because they were, in the then knowledge of steam, based on a principle of operation that could only end in failure.

In this barred state of the impulse turbine art came the radical, and at the time inconceivable, disclosure of De Laval. Like all great inventions it was simple, but with that simplicity was a practical change that scientifically and commercially was startling. Mechanically all De Laval did to the single-vaned impulse turbine was simply to diverge or widen the constricted outlet end of the steam passage of the old art. In steam dynamics his great discovery was that, beyond the critical point of steam, velocities can be accelerated at the expense of pressure energy, if the pathway is diverged, instead of constricted. Before his disclosure it was supposed, and not without some basis for such supposition, that a diverging nozzle would retard steam from creating kinetic energy, for such seemed the effect of a diverging outlet on a jet of water, and we now know that an extension of De Laval's diverging nozzle beyond limits now well understood makes his process ineffective. So revolutionary was De Laval's theory that the application for an American patent upon it was met by the objection of the Patent Office that:

"The object of applicant's alleged invention will apparently be defeated by the construction shown and claimed, since the fall of pressure due to expansion will necessarily lessen the velocity of the steam at the point of impact with the wheel, and consequently the 'vis viva' of the steam will tend to be a minimum rather than a maximum."

To this De Laval replied:

"The characteristic feature of applicant's invention may be expressed in a few words, thus: He expands the steam *before* it reaches the turbine and converts its pressure into velocity before the steam is required to do any work, while heretofore the steam was principally expanded in the turbine or other engine which was actuated by the pressure of the expanding steam. Applicant has made the discovery that by a flaring nozzle practically all the pressure can be converted into velocity, while before it could only be expanded down to 57.7 per cent. of the initial pressure, and that a jet can be

produced which is no longer capable of expansion, but which has an enormous velocity, and the vis viva of which can be economically utilized."

Since, as will hereafter appear, the patent of Curtis is based wholly on a turbine of the De Laval type, the fact of De Laval's absolute departure from all prior inventive effort is vital to a just appreciation of what Curtis subsequently did to supplement and utilize De Laval's discovery. This warrants our dwelling in such detail on the revolutionary character of De Laval's work. This is fairly stated by complainant's witness, who says:

"De Laval's original application, which was filed May 1, 1889, was met by the examiner by complete skepticism as to its operativeness. The effect of the conical convergence of the nozzle was held by the examiners to be the exact opposite of that alleged by De Laval. Further, the figure 57 per cent., which appeared in the application as a measure of the pressure which could not be converted into velocity in the ordinary converging nozzle, was not understood by the examiner, and an explanation was called for. The applicant was obliged to reply at length. The figure '57 per cent.' was supported by a reference to the treatise on Thermodynamics by Professor Herrmann, of Chemnitz (Berlin, 1879). The examiner's misapprehension as to the action of the diverging nozzle was explained by pointing out that even Professor Zeuner, who was then one of the greatest living authorities on thermodynamics, had committed himself in his publications to the same error—an error, indeed, which was then universally prevalent. * * * This debate continued year after year, and might have extended indefinitely had not the showing made at the Chicago World's Fair removed the question from the field of academic dispute. The patent was finally allowed June 4, and issued June 26, 1894."

De Laval's diverging nozzle resulted in producing an impulse single-vaned machine of a phenomenal character, in that the now utilized power of the steam produced a speed beyond all past experience, and so high as not to be permissive on account of stress on revolving parts.

But noteworthy and meritorious as were the contributions of Parsons and De Laval to the turbine art, their labors still left many serious objections to their turbines, which they were unable to remove. As has been justly said in testimony quoted below, this was not to be wondered at. In the reaction turbine, as we have seen, the steam is not jetted, but is admitted at initial pressure around the whole periphery of the chamber, or substantially so, and the creation and imparting of its kinetic power depends on its passage through inter spaces of the movable vanes. Such steam as does not go by that passage is lost. To insure, therefore, such intervane passage, and to prevent passage through the clearance between the ends of the moving vane and the chamber shell, is imperative. Owing to metallic contraction and expansion and other causes this was attended with grave difficulty, and sometimes resulted in stripping the revolving vanes. Clearance escapes, owing to the principle of operation of a reaction turbine, could not be avoided. They could only be measureably minimized by the most careful construction. Moreover, the intra-chamber, drop-pressure feature of the Parsons chamber, subjected it to the mechanical objection of axial or endwise thrust. This was due to the fact that there was a difference in pressure—a pressure drop—between the inlet and outlet side of each series of vanes. As the relative proportion of

clearance loss to vane-capacity increased as the vane diminished in height, the reaction turbine was restricted to large sizes. All this is clearly shown by complainants' witness, who says of the Parsons turbines, that:

"Relying as it did upon reaction, (it) developed its power by the pressure of the steam upon its vanes. There was a drop in pressure between the inlet and exit of each vane, consequently, clearance spaces must be as fine as possible, in order to prevent excessive leakage. At the time rotative speeds were very high compared with machinery other than steam turbines. Consequently it was extremely delicate and sensitive to derangement by steam erosion, intrusion of foreign substances, etc. The fact that it relied upon reaction also necessitated a vane speed virtually equal to the steam speed. This need for high peripheral speed prohibited the reduction of wheel diameters. Therefore, since the current of steam must occupy the entire periphery simultaneously, the radial dimension of the steam current in the earlier stages of the machine, was narrowly restricted. This minuteness also exaggerated the relative part played by the clearance spaces and their leakages."

While these objections of clearance, axial thrust, and prohibitive use of small wheels due to the use of the reaction principle were avoided in De Laval's single-vaned turbine by use of the impulse principle, yet it also revealed serious objections, due to its principle of operation. The tremendous speed it developed forbade utilization of that speed in large wheels, and necessitated the noneconomic practice of counteracting or neutralizing it even in the small wheels where it could be used. It should here be noted, as throwing light on the novel character of Curtis' subsequent work, that this excessively high speed of turbines was accepted as an insurmountable evil incident, and the whole trend of the engineering profession was to accept it as such. Thus in respondent's proofs Rateau's address (heretofore referred to) says:

"The Girard screw-wheel, which succeeded so well as a hydraulic motor, has given no public results as a steam apparatus. The failure of the tests which I just related, should not of course be in the least surprising. The problem was, in fact difficult to solve, *because in order to secure an economical operation, it is absolutely necessary to attain very high speeds of rotation.* * * * If steam turbines are compared with ordinary motors, both advantages and disadvantages are found. I would emphasize as the principal disadvantages of turbines resulting from the great velocity of rotation: (1) Heating of the bearings; (2) *the difficulty of driving shafts rotating at lower speeds;* (3) the difficulty of using a condenser. I put aside for the moment the question of consumption of steam."

De Laval himself sought in different ways to control the high speed he generated in his single-vaned turbine. In order to lessen the strain on parts, he devised a flexible central shaft so small in diameter that when running at very high speed such shaft and the whole rotating unit did not rotate around its geometric center, but tended to approach the center of gravity of the rotating system. As it was impossible to operate machinery by direct connection with the high-speeded turbine, he was driven to devise special reducing gears which were bulkier than the motor. Indeed, as showing the grave nature of the speed problems which were never overcome, it will be noted that the only effort of De Laval, as shown in his German patent, No. 84,153, to eliminate rather than accept these nonworkable speeds was his device to reduce the velocity of the jet itself before it entered the wheel vane by mass

compounding it with some passive liquid such as superheated water or other desired fluids to reduce its acceleration in the nozzle. In the same line of relief Bollman, of Austria, in his patents in many countries in Europe, beginning in 1894 and ending with his American patent, No. 584,203, of 1897, sought to introduce a mixture of air. In his work on the Steam Turbine (2d Ed., 189), Stodola says:

"The majority of the older patents showed·lack of knowledge of the steam flow. One idea especially led inventors on in spite of constant failure; to decrease the velocity of the steam by mixing it with fluids or gases."

After showing that even if they had succeeded, "there must be [in one particular one cited] a loss of kinetic energy that would amount to one-half to three-fourths of the available work," Stodola says:

"As patents are being taken up to the present time on this useless idea, it is well to investigate it somewhat more closely. The mixing of fluids must give, besides the loss due to shock, a poor performance in the blade channels, because the individual drops of the 'rain of this mixture' must become separated from the steam mass on account of the sharp bending of its path."

Notwithstanding then the elimination in De Laval's impulse turbine of the objectionable features of wheel-clearance, axial-thrust and non-use in small wheels, which lessened the efficiency and scope of the Parsons reaction turbine, the De Laval single-vaned impulse wheel was, by its high speed, also restricted in scope in that such speed prohibited its use in large turbines and prevented its use in small ones except when accompanied by supplemental speed-reducing gearing. It will thus be noted that great as the contributions of Parsons and De Laval were to the turbine art, the devices of both had grave limitations. On the one hand, De Laval could not utilize all the kinetic force his impulse turbine could call into play, and on the other hand, the limitations of axial thrust and clearance measureably counteracted and inefficiently lessened the kinetic energy the Parsons reactive type produced. The practical result was the restriction of Parsons to the field of large turbine effort, of De Laval to small, and that a field for further inventive effort remained is foreshadowed by respondent's proof where Rateau in his Paris address of 1890, already referred to, says:

"Is it then impossible to properly satisfy at once these two conditions: *To utilize high speeds of flow* and avoid too great losses in power? Probably not. I am even convinced that for this class of motor, as in the case of hydraulic motors, it will be possible without too great difficulty to obtain an efficiency of 75 per cent. *However this may be, the scheme which will give this result is yet to be found.*"

[2] In this state of the art Curtis devised the turbine covered by patent 566,969; and, before discussing what the device of that patent is, let us state clearly what it is not. So far as turbines meet the eye they are all substantially similar, but the real test of a machine is not its physical appearance, but the principle on which it works. Now of the Curtis device a few things are basic. Its principle of operation is not by pressure, for Curtis has no intrachamber change or stage of pressure, and because it has no pressure passages it has no clearance and no axial thrust. Manifestly, therefore, it is not a reaction turbine, and the pressure principle of operation of that machine was not used in it. It

follows, therefore, that whatever the success of Parsons in developing that principle was in reaction turbines, it did not anticipate or preempt the field of impulse turbines to which Curtis addressed himself. On the other hand, while Curtis' is an impulse machine, patterned after and indeed making De Laval its avowed foundation, and using the nonconverging nozzle invention of De Laval to create kinetic force, yet, at a vital point, a radical departure is made from De Laval, and on that departure Curtis' device rests. For the principle of operation of Curtis' turbines is such, and herein lies his novel and valuable contribution to the impulse turbine art, with its nonclearance, nonaxial thrust, simple and rugged parts, that instead of extracting *initially*, as De Laval has done, a kinetic force so great as to require neutralization or reduction, and, using it only on one vane and at a single pressure stage, he only extracts—and that by degrees—such power as is needed, a process termed hereafter pressure-staging, and as such requisite power is so extracted by degrees, he utilizes the whole of such extracted graded power by a process hereafter called velocity-compounding. If these facts be established, it follows that Curtis was not anticipated by either Parsons or De Laval, in that he gave to the art a low-speed, impulse turbine, which while using the general principle of pressure-staging as Parsons had done, so used it as to avoid clearances, axial thrust and exclusion from the field of small turbines, and while extracting kinetic power by a nonconverging nozzle as De Laval had done, avoided the creation of high speed, wasteful nonuse of potential power, and exclusion from the field of large turbines. His device was more; in that in a turbine of simple parts and rugged construction Curtis combined the excellencies and avoided the faults of both his predecessors. This in no wise reflects on the merit of those pioneers, as is conceded by complainants' expert. Indeed, how radical was the departure of Curtis from prior developments is simply but forcibly summed up in Curtis' own testimony. He says:

"After giving the subject a great deal of thought, it seemed to me that it would be possible to devise a machine which could be run at a much lower speed of revolution than any turbine which I was aware of, that would have an even higher efficiency, sufficiently high to enable it to take the place of the steam engine in large units. At the same time the machine could be made very rugged and mechanically simple, and the necessity for small blade or bucket clearance eliminated. I remember being very much struck with the fact that no machine having these characteristics had yet been produced, although a great amount of thought and experiment seemed to have been devoted to the subject."

He then in effect adds with commendable frankness that he took up the problem, not as one of pioneer work, but only as an improver on De Laval, saying:

"I was particularly impressed with the fact that no turbines had been built based upon the principle of staging or pressure compounding, what might be called generally the De Laval type of turbine, and it seemed to me that this principle offered the true solution of the problem."

It thus appears that the goal Curtis had in view was an impulse turbine which would work efficiently at a shaft speed so low as to not require speed-reducing gear, but would hold in reserve the poten-

tial power of the passing steam until its use was required at a sub-sequent stage. To do this he devised the novel scheme of subdividing, in an impulse turbine, the available energy of the steam, in transit, into a number of steps, or stages. This was effected by producing several successive chambers, connected by diverging or parallel nozzles. In this way it will be seen that, instead of using one chamber and one nozzle whereby the steam was expanded from initial to exhaust pressure, Curtis took what was the exhaust steam of De Laval's single chamber (which exhaust steam, as we have seen, had additional unutilized kinetic power which De Laval failed to utilize), and by means of interchamber nozzles he so treated the steam that it could be reused in a second nozzle and chamber, and indeed, in successive ones, with the result that he utilized, in stages, the kinetic energy which De Laval had lost. It will then be seen that he subdivided the available energy steam which De Laval found of nonavailable speed into a number of pressure steps or stages, so that a single nozzle would no longer have to expand the steam from initial to exhaust pressure, but a series of nozzles could successively expand it to intermediate stages until it finally dropped to exhaust pressure. The result of these subdivision stages of pressure reduced the steam velocity of an impulse turbine to a practical bucket speed, instead of attempting, as De Laval did, to increase his bucket speed to equal high steam speed. De Laval's turbine attained commercial efficiency by reason of his use of a rotating element which permitted extremely high bucket speed. But Curtis attained commercial efficiency by such a relatively low bucket speed as required no special mechanical expedients, and thereby secured an economical co-ordination of steam and bucket speed. But. as we later show, his disclosure was more than the mere duplication of De Laval's nozzle and chamber. Curtis co-ordinated his own several pressure stages so as to secure such subdivision of energy between the chamber stages that while taking the steam in succession and operating with the same shaft speed, the several stages were adapted to give an efficient abstraction of energy. Thus the several stages, while operating separately in an efficient manner, also co-ordinately and collectively operated to give over-all efficiency. This co-ordination involved such a proportioning of the nozzles and buckets of the several stages that the several stages, while under conditions of fixed shaft speed rotation, were nevertheless adapted to accommodate the steam flow, at the successively diminished pressure, so that the steam speed produced by the successive nozzles bore substantially the same relation to the bucket speed of all other stages. This was more than the mere physical duplication of De Laval's single chamber. It is true it involved the thought of the duplication of chambers, but to that duplication it coupled the inventive, novel, and practical disclosure of utilizing pressure by stages in impulse turbines, and so co-ordinating that subdivided pressure in successive chambers that, while using the steam in chamber-succession and operating at the same shaft speed, the several steam stages were adapted to give an efficient abstraction of energy, and while

each individual chamber operated efficiently, they all operated collectively and harmoniously to give a total of over-all efficiency.

"This," as was well said by complainants' witness, "involved such a proportioning and relation of the nozzles and buckets of the several stages that the stages were, under these conditions of fixed shaft speed rotation, adapted to accommodate the steam flow at the successively diminished pressures, and also so that the steam speed produced by the successive nozzles should bear substantially the same relation to the bucket speed for each stage as for all the other stages."

It will thus be seen that Curtis efficiently and for the first time practically co-ordinated different pressure stages in an impulse turbine, and effected such a subdivision of energy between the stages that the different chambers, while utilizing the steam in transit at different stages and on the same shaft, were by their interchamber jet connection adapted to secure and utilize an efficient and complete abstraction. While each, in a sense, operated independently, yet their co-ordination was such that all worked unitedly to give a satisfactory total efficiency. The mode of doing so Curtis clearly outlined in his patent:

"The method by which the turbine of my present invention operates consists in converting the pressure of the fluid into vis viva by stages and utilizing the vis viva developed at each stage by passing the fluid through rotating vanes, the speed of revolution of which is adapted to abstract substantially all or a large portion of the velocity. In practicing this method I first convert a definite amount of the initial pressure of the fluid into vis viva by passing a jet of fluid through a nozzle or passage properly proportioned to give the desired result, and I deliver the flowing jet to a movable element of the apparatus consisting of one or more circular ranges of vanes forming passages through which the jet passes and in which its direction of flow is changed, so as to extract its velocity wholly or largely whereby the vis viva developed in the nozzle or passage is wholly or largely converted into mechanical rotation. The fluid issues from this movable element into a stationary passage, which is so proportioned as to convert a further definite amount of the pressure remaining in the fluid into vis viva, and which delivers the fluid in a jet to the second movable element consisting of one or more circular ranges of vanes, by which the direction of the flow of the jet is changed, and its velocity is again wholly or largely extracted, whereby the vis viva developed in the intermediate passage is converted wholly or largely into mechanical power. The energy of the fluid may be converted into mechanical power in two or more such steps or stages, but it is essential that the various stages be so co-ordinated that the flow through the apparatus shall be continuous. To this end the successive working passages to which the jet is admitted in the movable elements of the apparatus are enlarged in cross-section, and correspond in size with the discharging ends of the successive stationary passages, and in each element in which vis viva is developed provision is made for carrying the same mass of fluid as is admitted to the first nozzle or passage, having regard to the volume and velocity. * * * The velocity developed and utilized at each stage may be the same, in which case the speed of the several movable elements will also be the same, or the former may not be the same, in which case the latter will also vary. The movable elements may be mounted on the same or different shafts. If they are mounted on the same shaft, but have different rates of motion, their diameters should be different, so that the speed at the shaft may be the same. * * * The pressure of the fluid jet is not reduced during its passage through the utilizing vanes, except to the extent necessary to supply what may be called the 'frictional consumption of energy' in the passage through the vanes. The passage must be enlarged in proportion thereto. * * * Figure 2 is a view similar to Fig. 1, showing a nozzle with parallel walls in-

stead of diverging walls. * * * K is a pipe or conduit leading from the steam boiler or other source for supplying the fluid under pressure. This pipe terminates in a nozzle L, which may have diverging sides, as in Fig. 1, or parallel sides, as in Fig. 2."

Practical working directions are also given:

"For purposes of illustration we will assume that the apparatus of Fig. 1 is designed to work between a boiler pressure of 150 pounds and an exhaust pressure of 2 pounds; these pressures being absolute and not by gauge (this exhaust pressure corresponding to about 26 inch of vacuum). The pressures existing at the discharging ends of the nozzle L and of the nozzles of the intermediate stationary passages M, N, and O will be such as to develop practically equal velocities at the delivery end of each of these nozzles; this velocity being, roughly, 1700 feet per second. The apparatus of Fig. 2 is intended to represent a noncondensing turbine, operating between a boiler pressure of 150 pounds (absolute), and an atmospheric exhaust, say 16 pounds pressure. In this case the pressures at the discharge ends of the nozzle L and of the nozzles of the intermediate stationary passages M, N, and O will likewise be such as to develop practically equal velocities at each nozzle, and in this case such velocity will be roughly 1300 feet per second."

It will thus be seen that the question whether a divergent or parallel expansion nozzle is required depends upon whether or not the velocity for which it is designed is above or below critical velocity, or what is the same thing, upon whether the lower pressure into which the steam is delivered at each stage is less or more than 58 per cent. of the higher pressure of the stage from which it comes. If the velocity desired is less than the critical velocity, the fall in pressure will be to a lower pressure, which is more than 58 per cent. of the higher, and therefore a divergent nozzle will not be used, as a straight nozzle will give all the velocity required. On the other hand, if a higher velocity than the critical is desired, the fall in pressure must be to a point less than 58 per cent. of the higher pressure, and a divergent nozzle is needed to fully convert such fall of pressure into velocity.

A second disclosure of Curtis' patent was velocity-staging or velocity-compounding. Prior to Curtis' patent it had been suggested that the potential velocity remaining in the exhaust steam from De Laval's turbine should be utilized by a second or third application of the jet to a second or third set of vanes. From this it is contended that Curtis' velocity-compounding is simply the multiplication of De Laval's single vanes. Had this been all Curtis did we may assume that De Laval or other inventors would have so duplicated. But the very fact they did not is in itself proof that more than mere duplication was involved in the intervening years between De Laval and Curtis. In point of fact no one prior to Curtis showed how such duplication could be practically done, and with good reason, for we now know that, in the absence of since discovered knowledge in the steam art, no such duplication was possible. At that time the knowledge of steam friction and rotation losses was not such as to make possible the utilization of succeeding velocity stages in impulse turbines. Indeed, before the possibility of such utilization could exist, a knowledge of steam friction and rotation was a sine qua non to determining the proper design of buckets of succeeding rows; and, in fact, the angles of the guide vane edges, and also the angles of the bucket of a sec-

ond and succeeding rows, depend on the velocity of the steam at such point. Undoubtedly the proofs show that in 1895, Sosnowski, in a paper on De Laval's Turbine, read before the Civil Engineering Society of France, suggested the velocity-compounding of that turbine. He stated that the steam on leaving the first row of buckets could be redirected against the second row, and in this way steam velocity that would otherwise be lost could be utilized. But neither he nor any other engineer showed how this could be practically accomplished. Public statement of such desiderata, in the absence of any solution, evidences the need of invention to answer it. And such inventive act had to await further knowledge in the steam art before it had any possible working basis. As said by one of complainant's witnesses:

"It was not until after the experiments of Odell in 1904, described in Stodola's Steam Turbine, page 134, and experiments by Stodola (see page 130) that the losses due to steam friction and the rotation losses were sufficiently determined to enable a correct design of a single pressure stage impulse turbine having two or more velocity stages. * * * No practical use was made of the velocity-compounding suggestion, nor could have been made, until it was made by Curtis, when his pressure-compounding scheme made velocity-compounding feasible."

And by another:

"This plan of repeated application of a steam jet to moving vanes, commonly called 'velocity-compounding,' is now known to have been always impracticable when applied to a jet embodying kinetically the entire energy of the steam because of the very great friction losses involved when steam speeds were so very high. When these steam speeds had been suitably reduced by pressure-staging, however, as now provided in the Curtis specification, the velocity-compounding of an impulse turbine became, for the first time, profitable and practicable."

Indeed, the seemingly inevitable loss of residuary potential velocity in the exhaust steam of a single impulse turbine was recognized by De Laval himself, for in an article by Olssen, published in the Swedish Engineering Journal, Teknisk Tids Krift, of February 11, 1893, and republished in a pamphlet distributed by De Laval at the Chicago Exhibition, is described the function of an ejector which partially exhausted the pressure within the chamber whereby supposed additional efficiency of the turbine was thought to result. Simply stated, the velocity compounding of Curtis' patent consists in venting the force of the steam jet on two or more successive sets of movable vanes in a series of single, pressure-staged chambers, and Curtis for the first time instructed the art how, by means of suitably designed movable and stationary vanes, a jet could be efficiently carromed and recarromed from successive movable to stationary vanes in such a chamber.

In this connection two things should be borne in mind: First, that at the date of Curtis' invention, and indeed until some time thereafter, owing to the fact that the losses due to steam friction and rotation were not then known, the duplication of vanes—which is velocity-compounding—in the single staged high speed impulse turbine of De Laval was impossible; and, second, that without such knowledge Curtis, by subdividing such impulse turbine into a number of pressure-

staged chambers, was able, in spite of the lack of such data and knowl-edge, through the lessened speed he obtained by pressure-staging, to multiply the vanes—and thus velocity-compound—not in a single stage impulse turbine, but in the separate pressure-staged chambers of a subdivided impulse turbine. Why the effect of this double or triple division of a jet upon two or three vanes in a pressure-staged cham-ber is such as to make three such velocity-stagings reduce periphery speeds as much as nine pressure-staged chambers is to us inexplicable, but such is its really wonderful effect.

Velocity compounding is thus set forth in the patent:

"I deliver the flowing jet to a movable element of the apparatus consist-ing of one or more circular ranges of vanes forming passages through which the jet passes, and in which its direction of flow is changed, so as to extract its velocity wholly or largely, whereby the vis viva developed in the nozzle or passage is wholly or largely converted into mechanical rotation. The fluid issues from this movable element into a stationary passage, which is so pro-portioned as to convert a further definite amount of the pressure remaining in the fluid into vis viva, and which delivers the fluid in a jet to the second movable element, consisting of one or more circular ranges of vanes, by which the direction of the flow of the jet is changed, and its velocity is again wholly or largely extracted, whereby the vis viva developed in the intermediate passages is converted wholly or largely into mechanical power. The energy of the fluid may be converted into mechanical power in two or more such steps or stages, but it is' essential that the various stages be so co-ordinated that the flow through the apparatus shall be continuous."

This brings us to the question, Was Curtis' disclosure of thus pres-sure staging an impulse turbine alone, or the combining of such pres-sure staging with velocity-compounding inventive? After a patient and thorough study of this record, we are satisfied it was. When Curtis started the work which eventuated in this patent the steam turbine problem was involved in complexity and uncertainty. The pioneer work of Parsons and De Laval was based on machines wholly unlike in basic principle of operation, and this dissimilarity rather tended to confuse and mislead those who sought improvement in lines common to both. Indeed, as noted in the earlier part of this opinion and justly stated by complainants' witness:

" * * * The successes and distinctive spheres of these two leaders tend-ed to lead away from the path Curtis followed of blending the advantages and avoiding the disadvantages of both. Each of these inventors and those who followed the path of each would be led in the same way—had had too great success along his own line to think of abandoning or fundamentally modifying or departing from the basic principle that had led him to success. Instead each naturally went ahead to perfect the details devised to overcome the defects developed by the application of his basic principle—De Laval in devising reducing gear, flexible shaft, and the reduction of speed by mass-compounding his working fluid; Parsons turning to his balance piston against axial thrust in place of the median-steam introduction of his original dis-closure and striving to minimize clearance steam escapes. Designers, less original than these turbine leaders, naturally also looked at the art from the standpoint of one or the other of these men, and worked for a future along these lines."

The situation is in our judgment most fairly summarized by a wit-ness of complainants, who says:

"The laws of steam action in these turbines was but dimly perceived, ex-cept that speeds must be kept down; and, since, in the entire history of steam

motors up to that date, the desideratum had always been to get rotative speeds up, past experience served only to puzzle rather than to help. The state of public opinion at that date may be had by a glance over the pages of the papers by Mr. K. Sosnowski, civil engineer, presented to the Société d'Encouragement Pour L. Industrie Nationale in 1896 (revised and published in book form in 1897 under the title Roues et Turbines a Vapeur), which was generally accepted by later writers as historically sound. Almost every conceivable combination and arrangement had been proposed or tried, but more or less blindly, and with universal futility. All that was plain, as the result of this, was that departure from Parsons or De Laval toward any novel principle of action must call for a thorough redesign of the entire machine and a departure into unknown territory."

As we have seen, Parsons and De Laval were pioneers in their several spheres, but they did not block the way to further advance. Curtis' advance consisted in giving to the art a device which, by its construction and mode of operation, avoided difficulties individually incident to both Parsons' and De Laval's turbines. Compared with Parsons, he eliminated clearances and avoided axial thrusts; compared with De Laval, he avoided the wasteful method of creating high speed initially and neutralizing it by reducing gears. Curtis, obtaining low speed initially, extracted subsequently the whole working force of the steam. As compared with both, he mechanically compacted his working parts and space into smaller compass, and in his turbine disclosed a principle applicable, as Parsons' was, to turbines of large size, and applicable, as De Laval's was, to those of small size. He gave the art a type of turbine which efficiently and for the first time showed working results different from any theretofore disclosed in the turbine art. We are clear in the conclusion that his device was not the work of a mere constructor in his art, but that of a reconstructor, who brought originality of conception, unlooked for and unsuspected lines of action and creative novelty in the disclosures he made. These features, coupled with his departure from beaten paths, and the novel and useful results he obtained by methods not before known, evidence the inventive nature of his work. We have no hesitation in holding his patent valid unless anticipated.

In taking up that question we limit ourselves to the measure of the scope of alleged anticipation in the prior art, contended for by one of respondent's experts, who said:

"The true state of the art in 1896 is that represented by Moorhouse, Harthan, Mortier, and De Laval, plus the same developed knowledge on which Curtis relies."

Now there is no proof that any of these men, save De Laval, produced a practical, efficient turbine, and there is a statement by the same witness:

"I do not know that the machines of Harthan, Tournaire, and Moorhouse were ever put into practical use, nor do I know if at their respective dates the engineering knowledge as to steam flow through nozzles, etc., was adequate to permit successful practical use of these machines,"

—which virtually admits they did not. A British patent, No. 144 of 1858, followed by an American one, was granted to the Harthans for a motive power engine to be worked either by air or steam, "whereby

the expansive and reactive force of the propelling medium is brought into play." A study of this patent shows that the Harthans did not purport to disclose any new principle of operation, but their device was based on the form of their buckets and the general arrangement of their machinery. If those features involved any new principle of operation, the patentees neither knew nor claimed it, or, indeed, anything save their peculiar bucket form, for they say:

"We are aware that rotary engines, consisting of wheels having a number of projections formed or fitted into their peripheries and actuated by the impingement of steam or air against such peripheral projections or chambers, have long been known in this country, and therefore we lay no claim to the principle of such arrangement * * * but what we consider to be novel and original, and therefore claim * * * is, firstly, the system or mode of obtaining motive power by causing steam or air to impinge upon a series of chambers with *curved bottoms* arranged round a wheel, at or near the periphery thereof, as herein described."

A study of the patent shows that these curved bottom chambers, which the Harthans regarded as peculiar to their wheel, are particularly described. Their device is described as made—

"* * * with a number of *peculiarly* constructed projections forming chambers somewhat similar to the buckets of an overshot water wheel. * * * The bottom or lower part of each chamber is made of a curved or nearly semicircular form, the curve commencing immediately at one side of the mouth, and terminating in the same lateral line, so as to extend from side to side of the chamber, or in the direction of the axis of the wheel * * * a jet or jets of steam is or are brought to play into these spaces or chambers entering therein nearly at a tangent to the periphery of the wheel. * * * The steam or air on issuing from the jet enters the spaces or chambers on one side, impinges against and passes over surfaces of the curved bottoms thereof, and issues out on the other side of the spaces nearly in an opposite direction to that at which it entered, thus imparting its force to the wheel by pressure and reaction and causing it to revolve."

These and other references thereto show that the operative element which characterized the Harthan turbine was the curved bottom of their chamber, and that all other features to which allusion is made were mere incidents\ thereto. The device left no impress on the art during the years that passed before Parsons first utilized the turbine, and we are therefore warranted in accepting, as an explanation of its nonuse, the statement of one of complainant's expert witnesses, who says:

"As to his simple impulse wheel, it is now common knowledge, and in Harthan's day was technical knowledge, that a jet from a converging nozzle could not convert into kinetic form more than about 15 per cent. of the energy potential in the steam. Hence the net efficiency of a wheel driven thereby could not exceed 10 or 12 per cent., a quite useless figure."

It is contended, however, that Harthan's disclosed velocity-compounding in their wheel, and in support thereof attention is called to their language:

"Fig. 6 represents a detail of a third modification, where we propose to employ two wheels $CC''$, each precisely similar to the wheel in the last described arrangement, both of such wheels being fast on one shaft $D$. A space is left between the contiguous falls of these wheels for the reception of four or more returning chambers $d$, $d$, the bottom of which are curved in a direction opposite to that of the bottoms of the chambers $c$, $c$, in the

wheels. * * * The jet on being first introduced impinges against the curved buttoms of the chambers in the wheel $c'$, and is then diverted against the fixed chambers $d$, $d$, whence it is again diverted onto the curved bottoms of the chambers in the second wheel $c$, and finally passes off by the escape pipe in the manner described."

To the lay mind and apart from all expert speculation in the matter, it would seem that when Harthan's single impulse wheel was not practically efficient, a mere suggestion of employing two wheels, "each precisely similar to the wheel in the last described arrangement," would tend rather to duplicate than eliminate the objections to the one. But laying aside this simple lay view and taking up the speculative one, it seems to us that the very most that may be said of Harthan's is the statement of Stodola in the 1910 edition of Die Dampfturburen, that the—

"predecessors of Curtis are John and Ezra Harthan in their English patent, No. 144 of 1858 (Fig. 695). The use of two velocity stages in an impulse turbine is here for the first time clearly proposed, the enlarging of the cross-section, and, moreover, even the divisions of the drops in pressure are particularized."

[3] But assuming they were predecessors, wherein did they precede Curtis? Stodola says they suggested for the first time the use of two velocity stages in an impulse turbine. But there are some inventions the inventive element of which consists in the conception of the novel abstract idea as contrasted with others wherein the invention consists in the practical means of applying what had theretofore been but a mere abstract idea. In the former the conception of the abstract idea necessarily involves the details of utilizing it. In the latter it does not. Here, as Stodola says, the Harthans for the first time may have clearly proposed two velocity stages in an impulse turbine, but, coupled with the proposal were no practical, efficient means of obtaining such stages, and tested by the common-sense truism, "By their fruits ye shall know them," we are unable to find in the disclosures of this patent, or by any results flowing therefrom, anything to minimize the value of the work of such men as Parsons, De Laval, and Curtis, who entered a field that, inventively, was barren. Nor does it serve to minimize the work of these men to say there was no call for high speed turbines, and therefore the quiescence of the art from Harthans to Parsons has no significance. For it will be observed, as the current of events narrated above shows, that when the call for turbines came Parsons had years and years of patient pioneer work in the field of reaction turbines following even the grant of his patent, before it was commercially and successfully applied, while in the impulse field De Laval's work was, as we have seen, so revolutionary that his disclosure was regarded as an impossibility by the patent authorities. In the face of the expenditure of such subsequent study and effort by engineers of all countries, to now contend that the vital features of pressure-staging and velocity-compounding were anticipated, disclosed, and utilized by Harthans in a fruitless patent, wherein the only characteristic claim was for curved bottom buckets, is a contention to which we cannot assent. On the contrary, we adopt, without here discussing the reason-

ing and illustration thereto warranting, the contention and conclusions of a witness for complainants, who says:

"As to Harthan's velocity compounded wheel, even if it were equipped with a De Laval nozzle, it could not be passably efficient when built according to Harthan's instructions. Harthan specifies that the two wheels, and the intermediate guides as well, are to be alike; whereas it was well known, even in 1858, that abstraction of vis viva in successive stages can be accomplished efficiently only when the first, second, and third sets of vanes are markedly dissimilar. * * * As to Harthan's list of possible modifications, he plainly classes them of quite incidental value. All but the last we now know to be trivial in their import. As to the last suggestion for the connection by piping of a number of separate casings, in each of which rotates an impulse wheel, through which casings the steam passes in series from boiler to condenser, * * * we now know that such a series of turbines would be practically inoperative. Its adjustments of relative pressures and speeds would be such unstable equilibrium that the slightest of the ordinary variations in actual service would put it out of commission. * * * In contrast with this, Curtis' invention, as disclosed in patent 566,-969, lay in first defining the problem in hand as the simultaneous reduction of wheel speeds, steam leakage, and delicacy of structure, and then in describing the combination of pressure staging with impulse action, aided by velocity compounding as the means thereto."

We next turn to the American patent to Moorhouse, No. 195,630, of 1877, for which same device his British patent of 1876 was granted, which is alleged to anticipate the pressure staging of Curtis. There is no statement in the patent as to whether Moorhouse's principle of operation was to be applied to reaction or impulse turbines, and whether he made use of the pressure or velocity of the steam. There is no reference anywhere to any jet, or impulsive action of steam. On the contrary, that his turbine was operated by pressure difference, rather than by velocity, is indicated where he says:

"The openings in the dividing plates between the several compartments are arranged so that the driving fluid, in its passage through them, operates upon the vanes or buckets upon the turbine wheel in the compartment into which it is passing, and the turbine wheel is thus with a force proportioned to the difference in pressure of the driving fluid in the two compartments. By the novel arrangement described, the difference of pressure between each two adjoining compartments is comparatively small, and it is thus possible to actuate the turbine wheels and the driving shaft at a moderate speed, which is impracticable where high pressure steam is used to drive a single turbine."

He further adds:

"If steam of 96 pounds per square inch is admitted through the inlet pipe h, the openings in the first dividing plate are of such area that its pressure is reduced to 92 pounds in the second compartment; and in its passage it drives the first turbine wheel with an effective pressure of 4 pounds per square inch only. In the same way it passes through all the other compartments in succession, its pressure being reduced 4 pounds per square inch in each, but its volume being increased proportionately by expansion."

In the British patent Moorhouse states the drop in pressure is one not only to the area openings, but as well to the compartment capacity, saying—

"the openings being of such area, and the compartments of such relative capacity, that the steam expands to a calculated extent in its passage."

211 F.—10

But not only does this strongly suggest that Moorhouse's was a reaction turbine, but in his British patent he refers to the description he has given in language which can be predicated on a reaction, but not on an impulse turbine, which, as we have seen, to be efficient cannot travel at over half the speed of the impelling steam. That language is:

"It is not necessary that the turbine wheels should be made to travel at the same speed as the steam which actuates them, as assumed in the foregoing description."

It is true the language following:

"They may be made to travel at a less speed than that of the steam, and very good results may be obtained when the velocity of the wheels is half that of the steam,"

—might be applied to an impulse turbine, as contended by respondent's experts; but, as it is undoubtedly referable as well to the reaction turbine of his "foregoing description," we think it would be a strained construction to apply the language in its juxtaposition to any other type of turbines, and Stodola, page 83, says:

"Moorehouse (Figs. 169 and 170) counts only upon pressure stages."

We, therefore, conclude that whatever principle of operation Moorhouse had in view, he threw no light on applying it to an impulse turbine. And this conclusion as to impulse turbines becomes more significant when the Moorhouse patent is considered with special reference to De Laval's type of impulse turbine, of which type the Curtis is, as we have seen, an improvement. For it must be conceded that whatever principle of pressure-staging Moorhouse disclosed, anything he disclosed was not applicable to the high speed impulse turbine which De Laval produced by his nozzles where there is no pressure difference at the inlet and outlet ends of the moving vanes, for, prior to De Laval, as we have seen, no one (and of course, Moorhouse) dealt with the then unknown condition of a pressure drop created solely in the nozzles. And, indeed, Gentsch, who in his Dampfturburen (an authority quoted by one of the respondent's witnesses as "a well-known member of the German Patent Office and a very high authority on steam turbines"), while classifying Moorhouse's turbine as an impulse one, wholly disassociated him and other designers from the De Laval type, saying:

"The steam which expands outside the nozzles, and which in the free jet wheels is mostly made to perform work during the period of expansion, is able to convert only a small portion of its pressure energy into current energy, so that the working of the velocity turbines hitherto discussed has not given a satisfactory economical result. * * * A better state of things was produced for the first time by the invention of De Laval."

Finding, then, as we do, that the disclosures of the Moorhouse patent had no helpful bearing or practical effect on the impulse turbine art, and supported in that conclusion by the fact that its vagueness is such that fair-minded witnesses in this record greatly differ as to what its disclosures really are, we are not warranted in attributing to it any effect in the way of vitiating, or even minimizing, the work of Curtis. We pass on to the Mortier article.

In 1890, Rateau, a French savant, read before the Society of Mineral Industries of France, two papers on the Parsons' turbine, which had been lately exhibited at the Paris Exposition.   In his first paper Rateau discussed that turbine, stating its advantages and disadvantages.   Several members expressed their views upon it, following whom M. Mortier stated "that this form of motor utilizes the complete expansion of steam," whereupon the president inquired "What advantage is gained by using the steam in the form of, velocity instead of using it in the form of pressure?"   Mortier's subsequent remarks were evidently prepared with reference to this question, and in order to gather their significance, it is important to determine what the president's question raised, and how it was understood by those present, and how it was acted upon.   That it meant a comparison of the worth of a reciprocating engine and some turbine is clear.   But what turbine?   Respondent contends it covered impulse turbines.   We cannot accede to this view. The question was raised by the president, not by Mortier, and, as we have seen, was called forth by the assertion of Mortier, who was apparently completely satisfied with the Parsons turbine: "This motor utilizes the complete expansion of steam."   Mortier was seeking or suggesting no other form or type of turbine, and the president, then, in substance, put the question as one between the Parsons turbine and a reciprocating engine.   Certainly Rateau so understood the question, for he answers "that he intends to treat this question and to *complete* his communication (which was based wholly on the Parsons turbine) at a future meeting"; and the society so understood, for its minutes state:

"Order of the day for the meeting of April 12, 1890:   The Parsons' Steam Turbine."

Moreover, Rateau's subsequent paper was based on the question between Parsons and the reciprocating engine, opening with the statement:

"I wish to-day to enter upon some considerations, theoretical for the most part, which will permit me to compare *this new kind of motor* with ordinary steam engines and to arrive at an estimate as to the probable future in store for it."

As if to emphasize and limit himself to this single issue, he announces his satisfaction with the Parsons machine, saying: "New types will undoubtedly succeed one another, and there is reason to expect within a short time the complete solution of the question *already fitly* answered by the Parsons system," and disposed of another type (Dow's) lately introduced, which he estimates as " * * * inferior, from various points of view, to that of M. Parsons," and of which " * * * in its present condition the system would not be of a nature to be widely introduced in practical industry."   He then takes up the Parsons, as the turbine basis of comparison with a reciprocating engine, and states his conclusions, which need not be quoted.

The minutes then state, "Continuing the preceding communication, M. Mortier gives the following information on the same subject." Without entering upon a discussion of Mortier's statements and calculations, it suffices to say that to us the inherent proofs of the pro-

ceedings show that they are directed to the Parsons type, which, as we have seen, was a reaction turbine. There was nothing in the subject before the society to suggest the introduction or discussion of impulse turbines. That meeting was discussing a particular reaction turbine; it was practical and efficient; the society had seen it operate. It was the contrast of this practical device with steam engine practice that body was discussing. There was no necessity for discussing impulse turbines, for no one had then produced one that was practical and efficient. And, as we have seen, no engineering basis of fact existed prior to De Laval for any speculation as to the future of the impulse turbine. If the striking effects of pressure-staging and velocity-compounding impulse turbines, which afterwards gave them efficient working value, were then realized and disclosed by M. Mortier's paper, he neither claimed them in his paper, his subsequent acts were in conflict with such a claim, and the engineering world ignorantly suffered years to pass, and misguided efforts, in other directions, to be made in the face of such disclosures. Indeed, if Mortier's address be assumed to apply to impulse turbines and to disclose Curtis' mode of overcoming their failings, Mortier's subsequent acts are inconsistent with such assumption. When he subsequently took up the subject of minimizing steam speed it was not, as shown by his two French patents of 1894 and 1895, on the principle of operation now alleged to have been disclosed by him, to wit, the principle of eliminating such speed, but on the principle of controlling such speed by mixing live steam with hot water or exhaust steam. This system, which as now known resulted in a loss of from one-half to three-quarters of available steam energy, shows that Mortier, instead of anticipating Curtis in his disclosure, followed in the lead of those inventors of whom Stodola said:

"The majority of the older patents showed lack of knowledge of the laws of steam flow. One idea especially led inventors on, in spite of constant failure, *to decrease the velocity of the steam by mixing it with fluids or gases.*"

[4] We next turn to the question of infringement. The disclosures of Curtis' patent, as we have seen, consisted, broadly stated, of pressure-staging an impulse turbine, the velocity-compounding thereof and the abstraction, at each passage of the steam, of substantially all or the principal part of the vis viva developed at the preceding stage. Without discussing the proofs in detail, we may say we find these features in the respondent's turbines. The proofs show the proposals made by them to the government for equipping certain vessels with turbines and a guaranty that certain results will be obtained. We are warranted therefrom in assuming the respondents meant to comply with their representations and contract guarantees, and, in the absence of any proof by them tending to give the court light on exactly what form of turbine they are constructing, we are, under the authorities (Peifer v. Brown [C. C.] 85 Fed. 780; Celluloid Co. v. Arlington Co. [C. C.] 85 Fed. 449) justified in resting on the proofs of complainants before us. These show that the principle of operation of respondents' turbine is distinctively impulse, that it is multipressure-staged, having 32 pressure-stages, 12 stages having two velocity rows each, and 20 stages one row each. On the same shaft is

mounted also a reversing multi-pressure-staged turbine having three pressure stages with two velocity rows each, and the rest with one. We agree with the deductions drawn by complainants, based on calculations on data as to bucket speed and steam speed furnished by complainants' witnesses, that the abstraction of vis viva by respondent's turbines is substantially and practically complete, the unused velocity amounting to 2.29 per cent. the energy, and this conclusion is confirmed by the standard of efficiency guaranteed to the government by the respondent under the designed full speed conditions.   That when operated under other conditions such turbines might abstract lesser amounts of vis viva does not free the turbine of its infringing character.   Being designedly made capable of infringement, its capacity to so infringe warrants the conclusion that it does infringe. It is contended, however, that infringement of the Curtis patent is not established unless there is an absolute and total abstraction of vis viva.   We find no warrant for this contention in the specification or claims of that patent, and we find no ground in reason or thermodynamic practice for such extreme contention.   The economies of fuel, power, and indeed all motive mechanism, are necessarily only approximately perfect.   Waste, loss of motion and power are incident to all mechanical, thermal, and motor operations, and the effort is to reach substantial, practical results rather than absolute, theoretical ones.   And such substantial abstraction was the measure Curtis disclosed in his specification.

"My object is to develop mechanical power from steam or other elastic fluid under pressure by *utilizing a large proportion of its vis viva in a turbine*, whose speed of rotation shall be low. * * * I deliver the flowing jet to a movable element of the apparatus consisting of one or more circular ranges of vanes forming passages through which the jet passes and in which the direction of flow is changed, *so as to extract its velocity wholly or largely whereby the vis viva developed in nozzle or passage is wholly or largely converted into mechanical rotation.*"

And the same thing is embodied in several claims in the words:

"Said vanes being adapted to abstract at each passage therethrough substantially all or the principal portion of the vis viva developed at the preceding stage."

In the same way we find no warrant in the patent for restricting the nozzles or passageways to the expansion pipe.   We have already pointed out earlier in this opinion that the patentee stated parallel and diverging nozzles were alternative constructions.   It is contended, however, that Curtis by his definition of expansion nozzles in another application to which this patent refers so restricted himself.   But the fact is that this definition was not originally embodied in that application, and its subsequent introduction in such former application was for reasons involved in that particular application.   Just principles of construction do not necessitate it, being by mere general reference specifically applied to a patent which expressly negatived, both in specification and figures, any such restricted meaning.   The partial peripheral introduction of the steam has been emphasized in complainants' testimony as a feature of marked advantage in impulse turbines, and

whch distinguished them from the reaction type. In his specification Curtis lays stress on this feature as one characteristic of all his passages, and as distinguished from introduction in annular form, saying:

"It is the design of my present invention, as of the apparatus of my prior application referred to, to employ at the delivery end of the nozzle and in the working passages a 'jet' of steam or other elastic fluid, i. e., a practically solid stream of fluid having an oblong form in cross-section, whose thickness bears a considerable proportion to its width, so that its cross-sectional area will be large compared with its perimeter as distinguished from an annular film of elastic fluid whose cross-sectional area is small compared with its perimeter. By this means the frictional retardation is greatly reduced and the efficiency is largely increased."

It is manifest, therefore, that a turbine which while it delivers "a fluid jet to a portion of the vanes within the first shell," but not to the succeeding ones, does not infringe a claim, one of the elements of which is "intermediate passages connecting the different shells together and delivering the fluid jet to a portion of the vanes of the different sets in succession." Gauged by these general conclusions, we find that, with the execption of the seventh and tenth, all of the claims charged are infringed.

[5] We next turn to patent No. 595,435, the first, second, third, and fourth claims whereof are alleged to be infringed. The object of Curtis, as stated in his application, was—

"to produce an elastic turbine operating under conditions of high efficiency in which variations in speed may be effected without great variations in the efficiency of operation."

This he accomplished by constructing and arranging the fluid passages of the turbine and their connections in such a way that the elastic fluid may be caused to traverse the movable vanes a greater or less number in succession. He states:

"The general plan of the elastic-fluid turbine being such as is described in patent No. 566,969, issued to me September 1, 1896."

The proofs show that for efficient operation the vane velocity should be about one-half the velocity of the steam action upon the vanes where the velocity is abstracted by a single set of vanes, and in like proportion if the velocity is fractionally abstracted by two or more sets of vanes, velocity compounded, and consequently, generally speaking, the vane velocity should be higher the fewer the number of stages into which the pressure drop is divided. This principle is used by Curtis, whose device, shown in the accompanying figure 1 is so arranged that the number of stages into which the pressure drop is divided may be varied according to the rotary speed at which it is desired the motor should be driven, a less number of stages being used for higher speeds, and a greater number for lower speeds. The wheels or sets of vanes, which are described as mounted on a common shaft, are contained in separate casings, and the steam from the boiler is delivered to the nozzle I, to act upon the vanes in the first casing, in which the pressure is lower than in the boiler, and from which the steam passes by passage N through the nozzle J, in passing

through which it expands and acquires velocity and enters the second casing, to act upon the wheel vanes therein, and so on to the third and fourth casings, from which the fully expanded steam is delivered through the exhaust passage $Q$. Provision is made for controlling the steam passages so that the steam may be made to have a less number of expansion stages, this provision being shown in the foregoing figure as afforded by the exhaust passages $RST$, each provided with a shut-off valve. These passages respectively communicate with the connecting passages $NOP$, between the successive stages so that, if, for example, the valve and exhaust passage $T$ is open, the steam will exhaust at the end of the third stage, and the fourth stage and parts pertaining thereto will be cut out of action. By the division of the pressure drop into three stages, the velocity of each stage will be increased as compared with that produced when four stages are used, being about four-sevenths instead of one-half of the velocity due to the total drop. Similarly, if the valve in the passage $S$ were opened, steam would exhaust at the end of the second stage and the velocity in the two stages would be about five-sevenths of that due to the total drop, and if the valve in the passage $R$ were opened the entire pressure drop would be used at a single stage, giving a steam velocity, and consequently an efficient wheel velocity, almost double that produced when the four stages are used. It will thus be seen that what Curtis really disclosed is simply taking and equipping with cut-off devices, a multi-staged turbine of the type of the patent we have already described, and fitting it with devices whereby different chambers could be operated or by-passed as desired. The particular means employed by him are embodied in claim 6, which is not charged to be infringed. Assuming, for present purposes, that such device is patentable, and that Curtis is entitled to a monopoly of a specific device embodying a combination of parts as will control the use of the several chambers of a turbine, it does not follow that he is entitled to such generic claims as are here involved, and which, if sustained, would give him a monopoly of all turbines using controllable passages whereby the steam is made to act upon movable vanes a greater or less number of times in succession. In view of the recognized practices of steam control and the special character of Curtis' device, it would be a perversion of patent law and principles to make this control device of his a basis for monopolizing the whole field of steam passage control by inclusive claims such as are here involved. Accordingly, we hold these four claims invalid.

[6] It remains to consider another question presented by the record. The infringement complained of is referred to in paragraph 21 of the bill, which avers that defendant did, before the beginning of the suit—

" * * * offer in writing, accompanied by plans and specifications, to make for, and to sell to, the United States government, elastic-fluid turbines for propelling ships—or, in other words, for marine propulsion other than automobile torpedoes—employing and containing the inventions set forth in each and all of the several letters patent; that the offer so made by the defendant has been accepted by the United States government; that the defendant is at present under contract to make such infringing elastic-fluid tur-

bines; that the work of construction of such infringing turbines is now being proceeded with by said defendant within the eastern district of Pennsylvania, and elsewhere in the United States, for the purpose of furnishing the same to the United States government under the said contract; that all of said acts and doings by the defendant have been and are without license or allowance, and against the will of your orators, and in violation of their rights; and that the defendant is threatening to carry on its aforesaid acts to a large extent in violation and infringement of the rights and privileges of your orators, and to their great and irreparable loss and injury," etc.

Accordingly, paragraph 23 prays defendant may be decreed to account and pay over all such gains and profits as have accrued or may accrue "by reason of any such infringement," and also account for and pay over all damages sustained or to be sustained "by the said unlawful acts"; and a perpetual injunction is prayed to restrain the defendant from "directly or indirectly making, constructing, using, vending, delivering, working, or putting into operation or use, or in anywise counterfeiting or imitating, the said several inventions, or in any elastic fluid turbines made in accordance therewith, or like or similar to those which the defendant has contracted to make for the United States government in infringement of the said several letters patent," etc.

It is also prayed—

"that any elastic-fluid turbines or parts thereof infringing any or all of the said several letters patent mentioned, and which may be in the possession of the defendant, shall be destroyed, or delivered up to your orators or an officer of this court to be so destroyed."

The bill also prayed formally for a preliminary injunction, but no motion was made for this relief. Since the litigation began, the two torpedo boat destroyers referred to have been finished and delivered to the government, and the plaintiffs do not now ask that the decree shall in any wise be directed against these vessels, or against the government in respect thereof. The bill contains no averment that the defendant is building or threatening to build infringing turbines for commercial use; only certain ships of war are involved in the suit; and, for reasons to be briefly stated, we are of opinion that no injunction should now be granted. We do not agree that the court below should have dismissed the bill for want of jurisdiction. Neither the United States nor one of its officers is a party defendant, but the suit is brought solely against a private corporation that had contracted to do certain public work.

The bill was filed in 1909, and we think there was then no doubt that the court below had the right to entertain it. It had been much debated, and had been variously determined, how far an injunction might interfere with the acts of government officers, who in their official capacity were infringing or were threatening to infringe the rights of patentees. The Supreme Court had refused to permit a plaintiff to interfere with property owned by the government and in its actual possession, but no such decision had ever been made concerning property that was still in the course of preparation for public use by a contractor with the government. The facts in Dashiell v. Grosvenor, 13 C. C. A. 593, 66 Fed. 334, 27 L. R. A. 67, present this

situation as nearly as any other case, and it may be worthy of note that the Supreme Court took jurisdiction of that dispute on the merits, and decided the question of infringement. On the face of such a bill as is now presented, the controversy is primarily between individuals, and no reason is perceived why the equitable jurisdiction of a court does not attach. There may be sufficient reasons of public policy to induce the refusal of relief by injunction, either at a preliminary stage or after final hearing; but this is a separate question, distinct from the principal matters of dispute, and does not operate retroactively to take away the power of the court to hear and determine the controversy on its merits. The relief to which a plaintiff would ordinarily be entitled in a suit between individuals may be denied in a particular case for special reasons, as it may be denied where no question of public policy can possibly arise; but, we repeat, this of itself does not oust the court of its equitable jurisdiction to hear and decide the suit.

But since the suit was brought, the act of 1910 has been passed, and has been interpreted by the Supreme Court in the recent case of Crozier v. Krupp, 224 U. S. 290, 32 Sup. Ct. 488, 56 L. Ed. 771. This statute, we think, furnishes a practical solution of the questions arising upon this branch of the case. Even if the plaintiffs did not disclaim the desire to interfere with the government's possession of the vessels, there is no longer any ground upon which a final injunction can be properly rested, even in a suit against a contractor with the government, where the dispute concerns such property as vessels of war. If the United States has infringed, or shall hereafter infringe, the patents that we have been considering, the act of 1910 permits the plaintiffs to sue in the Court of Claims. Crozier v. Krupp, supra. And if the defendant shall undertake to infringe hereafter by making offending turbines for commercial use, relief can be obtained by another suit.

The plaintiffs are entitled to a decree sustaining patent No. 566,969 so far as indicated in the foregoing opinion, and ordering an account, but an injunction will be denied. Accordingly, the decree entered in the District Court is now reversed, with the costs of this court, and the case is remanded, with instructions to enter a decree in accordance with this opinion. We leave the question of costs in the District Court to be disposed of by that tribunal.